The petitioner filed her petition for divorce from bed and board against her husband on the ground of adultery. The wife is forty-two years of age, the husband fifty-two (although he looks to be a much older man, and says he has *Page 84 
been weakened greatly by a number of operations), and the co-respondent is forty. The parties were married in 1903 in Belgium, and the co-respondent was employed as a nurse in the household in 1905. At that time she was about twenty-one years of age. The wife is a Belgian; the husband was born in Germany. The co-respondent is a German. When the war broke out in 1914 the husband and wife, with their five children and the co-respondent, went to England. When they arrived at Folkestone the wife said she wanted to return to Belgium to get some winter clothes for the children, and, perhaps, to do war work. When she got to Antwerp the Germans had made such progress that she was unable to leave for some two months, and escaped in November, 1914, and returned to Folkestone. The husband says that he protested against her leaving him in England and returning to Belgium and desired her to stay, and said to her that if she returned to Belgium "then it is finished once and forever, and that is how our relations came to an end. I mean my love was finished once and for all." And, in answer to the question, "You would never live with her again?" he said, "Yes, that is what I said." On cross-examination he said, "I meant the finish of my affections, yes." He also said that he meant that he was through with his wife, so far as affection was concerned, and that has remained true.
Before the wife arrived at Folkestone upon her return from Belgium the husband, with the five children and the co-respondent, came to America and settled at Hasbrouck Heights. The wife came over about a month later and met her husband at Hasbrouck Heights. The evidence shows that on May 5th, 1915, at Hasbrouck Heights, there was a great storm raging, and the wife says that she heard a great noise downstairs, and knowing that the trap-door to the cellar was open, she went to the bedroom of her husband to have him go down and fix it. (At that time they were not occupying the same bed nor the same bedroom.) The wife says that when she reached the husband's room and opened the door she saw the co-respondent in bed with her husband, and that the co-respondent, upon seeing her, placed her hand *Page 85 
over her eyes. The co-respondent says that, on this same occasion, "I woke up; there was a fearful storm, and a door was slammed down in the cellar, and I got up to wake Mr. Salman, and I walked to his door and walked in and asked him to see what it was, and in a few minutes Mrs. Salman walked in, too, and saw me in the room. She did not say a word. Mr. Salman was in bed." She says, further, that, seeing the way the wife took the situation, she was so affected that she wrote a letter and put it under the door of the wife's room, in which letter she said that if Mrs. Salman felt that way about it, or words to that effect, she would leave. She did not, however, leave, and the wife says she did not at that time ask her to, fearing her husband. The co-respondent also says that she spoke to the wife afterwards and told her that if she felt that she had done wrong she would leave. The wife, on the contrary, says that after this event she desired the woman to leave, but she would not do so.
The husband and wife went to Hot Springs twice, about 1918, and, upon the second occasion, the husband says he had intercourse with the wife there for the first time in years; and she says, in substance, that they rather talked of agreeing to forgive and forget. He says that she tried to bargain with him for the possession of letters which he had and which had been written to her by other men, and it is quite plain that he suspected her of adultery.
In 1919 the wife discharged the co-respondent, and after that, the wife says, he discontinued his former practice of coming home at night excepting at week-ends, and acted toward her as a polite stranger. This is denied by the defendant.
After the co-respondent left she telephoned the defendant, giving him her address, and she says this was done for the purpose of having her mail sent to her, but, as I recall, she also says that he took her to dinners and treated her as a social equal. In 1920 the wife went to Belgium with her children, to be gone about a year, but has not returned since. About eight or nine months after the wife left the co-respondent came back to the house of the defendant in East *Page 86 
Orange. For two years after she returned the co-respondent and defendant lived alone in this house, with bedrooms on the second floor, and without servants or anyone else in the house. At the end of the two years a chauffeur and his wife came to live with them, and occupied the third or top floor, with the defendant and co-respondent continuing to occupy the same bedrooms even after suit started and down to the trial. The new chauffeur and his wife testified that the chauffeur used to go to the tube station in Newark and meet the co-respondent and the defendant and bring them to the home, and that this continued down to within two days of the trial. In May, 1922, defendant and co-respondent went to Europe on the same steamer, she going to see her relatives and he to visit his wife and children, and both returned in August, 1922, on the same steamer. This was all pre-arranged. The evidence does not disclose any misconduct on board ship.
The versions of the petitioner, defendant and co-respondent as to what happened on the night of the storm are virtually the same, excepting that the petitioner says that the defendant and co-respondent were in bed, and they both deny it. The husband says that after this scene his wife accused him of adultery with the co-respondent hundreds of times, and the co-respondent swears to frequent quarrels between them. This continued until 1919, when the petitioner ordered the co-respondent from the house, and she left. The co-respondent admits that, from the night of the storm, she knew that the petitioner said to her husband that he was guilty of improper relations with her, and that from that time she knew that the petitioner had suspected the defendant of improper relations with her.
After the return of the co-respondent to the home of the defendant, she, with the defendant, went to New York at night, to dinners and theatres, about once a week.
There is no direct evidence of desire on the part of either the defendant or co-respondent shown, excepting from their relations as above stated. The testimony of strangers is that they never saw the co-respondent and defendant kissing or *Page 87 
hugging, or, by glances or other manifestations, giving indication of love or affection. Both the husband and the co-respondent deny positively any adultery.
The husband, when asked if he thought his conduct was not indiscreet in keeping this woman in the house under the circumstances, said he did not think it was in view of his age and weakened state as the result of his various operations. The defendant, at the time he testified, was fifty-two years of age; at the time of these happenings he was about forty-eight. He is an intelligent man, fully capable of judging of the proprieties. He knew that his wife charged him with adultery with the co-respondent, and the bedroom episode during the storm, while enough to create a suspicion in the mind of the wife by reason of the prior friendship of the parties, is hardly sufficient to found a finding of adultery — the wife swearing one way and the husband and co-respondent swearing another. But she was in his room, and their subsequent continuance together down to the time the wife put the co-respondent out; his meeting the co-respondent in New York and taking her to dinners, from the time of her ejection to her return, and his bringing her back to the home after his wife went back to Belgium; his taking her to dinners, the theatre and opera while living together, and their living together for a period of two years, during the wife's absence, alone, and even continuing to live together down to the date of the trial, with only the addition of the chauffeur and his wife as members of the family, all this being done when each had knowledge of the charge made by the wife that for a number of years their relations had been meretricious, indicates that they had such a feeling for each other that they could not satisfy the proprieties by staying apart, and indicates, to my mind, in dealing with persons of the refinement and education of the defendant and co-respondent, that such acts and conduct evidence strong desire, and, living together as they did, are sufficient to prove adultery.
A decree will be advised for the petitioner. *Page 88